**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| DYNAENERGETICS EUROPE GMBH and DYNAENERGETICS US, INC., | § § § | |
| *Plaintiffs,* | § § | |
| | § | |
| v. | § | Civil Action No. 6:20-CV-01201-ADA |
| | § | |
| NEXTIER COMPLETION SOLUTIONS INC., | § § | Jury Trial Demanded |
| | § | |
| *Defendant.* | § § | |
| | § | |

**<u>DEFENDANT'S REPLY IN SUPPORT OF ITS CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

I.      "tandem seal adapter" (Claims 1 and 8) ..................................................................1

II.     "connected to" (Claims 1 and 9)..........................................................................5

III.   "first end" / "second end" (Claim 1)....................................................................6

IV.   "first pin connector end" and "second pin connector" (Claims 1 and 2)..............................7

V.     "bulkhead connector element" ("BCE") (Claims 9 and 10) ...................................................8

VI.   "it is not possible to interrupt the electrical signal . . ." (Claim 2) ........................................9

Conclusion ...............................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012). ........................................................................ 4

*Aylus Networks, Inc. v. Apple Inc.*,
   856 F.3d 1353 (Fed. Cir. 2017) ......................................................................... 3

*DynaEnergetics Europe GmbH et al. v. G&H Diversified Manufacturing, LP*,
   Case No. 6:20-cv-01110-ADA (W.D. Tex. Nov. 8, 2021) .............................. 3, 8

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016) ...................................................................... 2, 3

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ......................................................................... 2

*Pixion, Inc. v. Citrix Sys., Inc.*,
   Case No. 09-cv-03496, 2011 WL 5191832 (N.D. Cal. Nov. 1, 2011) ............... 4

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ......................................................................... 3

*Thorner v. Sony Computer LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ......................................................................... 3

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (en banc) ......................................................... 8

**Statutes**

35 U.S.C. § 112(f) ............................................................................................ 4, 8, 9

The biggest clue that Dyna's positions are incorrect is that it asserts that every technical term—including the term "tandem seal adapter," which Dyna admits does not even have a known meaning—needs no definition (and should be given its "plain and ordinary meaning"), while the one term that has a plain meaning to any lay person—"connected to"—should be given an overly-narrow and ambiguous construction.  For the reasons discussed below, the Court should reject Dyna's attempt to alter the scope of its patent through unwarranted claim construction positions.

Additionally, in an effort to streamline the parties' disputes, the various defendants note that they have made minor grammatical changes to harmonize the proposed constructions for each term.  As reflected in each defendant's opening brief, the original proposed constructions were all substantively identical and differed only in minor verbiage and word choices.  However, in light of Dyna's concern that such minor differences could still unnecessarily burden the Court, the defendants have coordinated their constructions and arguments in an effort to promote judicial economy and conserve resources.

**I.     "tandem seal adapter" (Claims 1 and 8)**

As an initial matter, despite minor differences in wording, Defendants universally agree to the following proposed construction for "tandem seal adapter" ("TSA"): "adapter configured to form a seal between two gun carriers/tools that are directly attached to each other."

Dyna's response fails to adequately address the 500-pound gorilla in the room.  By the admission of Dyna's own expert, the term "tandem seal adapter" is not a common or accepted industry term.  *See* Dkt. 56-3 (Ex. B) at ¶ 40.  Simply put, the term cannot be given its plain and ordinary meaning—as urged by Dyna—because ***there is no plain and ordinary meaning***.  Instead, Dyna coined the term "tandem seal adapter" for a specific component of its disclosed gun assembly.

1

Under Federal Circuit law, coined terms can only be construed to the extent supported by the patent specification. *See Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (holding that such terms "cannot be construed broader than the disclosure in the specification"); *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (holding that such terms can be "construed only as broadly as provided for by the patent itself"). This is for good reason—if a term has no plain and ordinary meaning, the ***only*** way for the public to understand the metes-and-bounds of the claim and avoid infringement is to look to the specification.

This is particularly critical here because Dyna deliberately chose not to use an industry-standard term like "sub" that already had a commonly understood meaning. *See, e.g.*, Dkt. 56-4 (Ex. C) at 33:1–4 (conceding that the term "sub" is a common term in the art). Even more problematic for Dyna, the '697 Patent is unwavering in its disclosure of the "tandem seal adapter" as a component that is ***internal*** to the gun carrier and seals off two guns/tools that are ***directly*** connected together. This is the opposite of a sub, which a POSITA would understand forms part of the ***external*** tool string by indirectly connecting two guns/tools together. *See* Dkt. 56-6 (Ex. E) at ¶ 21.

As previously explained, this is a fundamental distinction given the dramatic exposures to heat, pressure and physical forces that the external components of the tool string must endure in the wellbore. *Id.* In essence, Dyna is trying to capture prior art subs even though its patent does not use that term, does not equate the "tandem seal adapter" to a sub, and does not disclose any embodiment that would be considered a sub by a person of skill in the art.

In response, Dyna argues that its own expert's admission should be disregarded because he made that admission in the context of "a different patent, U.S. Patent No. 10,472,938." *See*

Dkt. 61 at 9.  But the '697 Patent is a direct continuation of the '938 Patent and shares an *identical* specification.   "A statement made during prosecution of related patents may be properly considered in construing a term common to those patents." *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015).  This includes statements made during post grant proceedings, such as the admission of Dyna's own expert. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017). Indeed, Dyna's expert agrees that "with respect to the '697 Patent, the term 'tandem seal adapter' is used in the same manner as the '938 Patent and enjoys the same meaning." Ex. K at ¶¶ 91-93.

Similarly, Dyna's argument that "disavowal" is required is misplaced.  Disavowal is only relevant when a patentee "inten[ds] to deviate from the ordinary and accustomed meaning of a claim term." *Thorner v. Sony Computer LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  But, as noted above, "tandem seal adapter" has no plain and ordinary meaning from which to deviate.  Instead, terms that have no plain meaning "cannot be construed broader than the disclosure in the specification." *Indacon*, 824 F.3d at 1357.  Indeed, Dyna even agrees that to understand what a "tandem seal adapter" is, one would need to look to "[t]he claimed structure and configuration [that] are shown in the figures." *See DynaEnergetics Europe GmbH et al. v. G&H Diversified Manufacturing, LP*, Case No. 6:20-cv-01110-ADA (W.D. Tex. Nov. 8, 2021), Dkt. 56 at 5.  But Dyna admits that the "embodiments illustrate the claimed tandem seal adapter as an *internal* component"—i.e., a component that forms a seal inside two guns/tools that are directly attached together.  Dkt. 61 at 7 (emphasis added).

Dyna's argument that a jury would know what a "tandem seal adapter" is based on other claim language is merely an attempt to evade Federal Circuit law.  By ignoring the actual embodiments in the specification, Dyna is seeking to avoid the defining characteristics of the

coined "tandem seal adapter" and secure a ***broader*** construction.  In effect, Dyna is trying to transform the term into a "nonce" word that is only given meaning by the surrounding language.  But nonce words are governed by § 112(f) and are similarly restricted to the corresponding structure in the specification for the same core reason: the public can only understand the boundaries of such nonce words by looking to the specification for guidance.

Dyna's reliance on a lone case from the NDCA does not solve its problem.  *See id.* at 6 (citing *Pixion, Inc. v. Citrix Sys., Inc.*, Case No. 09-cv-03496, 2011 WL 5191832 (N.D. Cal. Nov. 1, 2011)).  The term at issue in *Pixion* was an action consisting of common words: "receiving information allowing for conference attendance."  *Pixion*, at *11.  As a result, the court simply held that the "the plain and ordinary meaning is easily accessible" to the jury.  *Id.*  In contrast, even Dyna's own expert admits that the term "tandem seal adapter" has no plain and ordinary meaning, which means that its meaning is not and cannot be "easily accessible" to a jury.

Lastly, Defendant notes that its construction does not require the presence of two guns/tools to satisfy Claim 1.  Instead, the proposed construction merely specifies that the tandem seal adapter is "configured to" join two guns/tools together, which is variously used to mean "capable of" or "suitable for."  *See, e.g., Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012).  That is, no second gun/tool is required, but the tandem seal adapter must be suitable for forming a seal between two guns/tools that are directly connected together.  This is consistent with Dyna's previous construction in a PGR, which began with "a component that creates a seal between ***adjacent gun housings*** . . ."  Ex. L at 2 (Preliminary Response, PGR2020-00080, at 12 (Nov. 18, 2020) (Paper 6)) (emphasis added).  As a result, Dyna's argument is a red herring.  For the forgoing reasons, this Court should construe "tandem seal adapter" as an "adapter configured to form a seal between two gun carriers/tools that are directly attached to each other."

## II.      "connected to" (Claims 1 and 9)

Dyna's proposed construction turns a relatively simple term with a well understood meaning—i.e., "joined or coupled together"—into a complicated term that invokes degrees of resistance and arbitrary exclusions.  By requiring a connection to "resist separation" but carving out connections that involve "merely physical contact," Dyna seeks to transform the term "connected to" into an unwarranted debate over whether the connection is ***adequate***.  But this is not part of the claim language and not part of the specification.

Instead, the '697 Patent invokes the term's normal usage; for example, by discussing how one end of a part "abuts/connects to" another.  *See, e.g.*, Dkt. 56-2 (Ex. A) at 7:58–60.  Nothing in the patent's usage implies that connected parts cannot be merely physically joined and/or easily separated.  Dyna's provides zero support for its argument that "connected to" has some industry-specific definition that warrants departing from its common usage.  In reality, Dyna's citation to a general "Advanced Learner's Dictionary"—as opposed to a specialized oil and gas publication—is an implicit concession that "connected to" has no special industry meaning.

Additionally, Dyna's attempt to fault Defendants NexTier, G&H, and GR for proposing a construction (as opposed to simply proposing "plain and ordinary meaning") is nonsensical.  However, G&H initially proposed "plain and ordinary meaning" during the parties' exchange of proposed constructions in the Southern District of Texas case prior to its transfer.  *See* Ex. M (G&H's Preliminary Claim Constructions, Case No. 3:20-cv-00376 (S.D. Tex. June 10, 2021)).  After receiving Dyna's overly-narrow construction, NexTier offered its current proposal to help highlight the specific dispute for the Court—namely, whether the term "connected to" should be restricted in the specific ways urged by Dyna.

5

Dyna's argument that "a POSITA would also understand that a firm and secure connection . . . could be achieved by multiple different methods (e.g., with the use of threading, O-ring seals, etc.)" only adds to the confusion given that these methods *solely* involve physical contact.  *See* Dkt. 61 at 10.  As a result, threaded connections that do not also involve some other connective force, such as chemical adhesive or welding, would fall outside of Dyna's construction.  Setting aside that problem, however, Dyna itself appears to acknowledge that its construction requires unjustified debate over whether the required connection is "firm and secure" enough.  *Id.*  But the only thing required by "connected to" is a connection.

Finally, Dyna's argument that its construction is warranted because of a separate claim limitation requiring the tandem seal adapter to "provide a seal" makes no sense.  *See* Dkt. 61 at 10. Specifically, the language referenced by Dyna states that "the tandem seal adapter and the pressure bulkhead are configured to provide a seal."  *See* Dkt. 56-2 (Ex. A) at 11:44–46.  But this limitation is met if those components provide the required seal, regardless of how they are connected or whether the tandem seal adapter is "merely [in] physical contact" or "resists separation."  Indeed, the use of O-rings is a method of providing a seal that merely involves physical contact and allows for varying degrees of separation resistance.  Given that "connected to" does not have a special industry meaning, Dyna's attempts to inject negative limitations and uncertain terms of degree is improper. The Court should adopt the plain dictionary definition: "joined or coupled together."

III.   **"first end" / "second end" (Claim 1)**

As with "tandem seal adapter," Defendants have harmonized their constructions—which are all substantively the same—to remove minor wording differences.  Accordingly, the Court should construe the above terms to mean the "[first/second] farthest or most extreme part or point."

As detailed in Defendant's Opening Brief, based on the prosecution history, the "end" must

6

include the farthest or most extreme point.  In response, Dyna agrees with this assessment: "a POSITA would readily understand that the 'end' of the tandem seal adapter would encompass the full region in which the connection takes place—***up to and including the farthest or most extreme part or point***—and is not limited to only the 'farthest or most extreme part or point lengthwise.'" *See* Dkt. 61 at 12.  Accordingly, Defendant's construction conveys the terms' plain and ordinary meaning.

## IV.  "first pin connector end" and "second pin connector" (Claims 1 and 2)

For these terms, Dyna argues that Defendant's construction "simply rearranges the order of the words and injects needless wordiness and duplication into the claims."  *See* Dkt. 61 at 14. But Defendant's construction makes clear that the first and second "pin connector ends" are simply the respective ends of the pin connector assembly, which is neither circular nor redundant.

In fact, Dyna itself recognizes that the first and second "pin connector end" are the ends of the pin connector assembly.  In its discussion of the term "pin connector assembly," Dyna itself has labeled each end of the pin connector assembly as the "pin connector end":



*See DynaEnergetics Europe GmbH et al. v. G&H Diversified Manufacturing, LP*, Case No. 6:20-cv-01110-ADA (W.D. Tex. Nov. 8, 2021), Dkt. 56 at 15.  Based on this representation, it appears that the parties do not actually dispute the plain and ordinary meaning of this term.

7

**V.**     **"bulkhead connector element" ("BCE") (Claims 9 and 10)**

Dyna's argument that the "bulkhead connector element" is not means-plus-function is insufficient and mainly rests on the presumption that §112(f) is not invoked because the word "means" is not in the claim language. *See* Dkt. 61 at 17. But the Federal Circuit has held that this presumption is rebuttable and not particularly strong. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348–50 (Fed. Cir. 2015) (en banc) (expressly overruling cases holding that this is a "strong" presumption). Here, the generic terms "element" and "connector"—combined with the fact that the claims and specification solely refer to the bulkhead connector element's function as opposed to its structure—means the presumption is overcome.

Dyna's argument that a POSITA would know "the materials, assembly, and electrical concepts required to carry out this aspect of the claimed invention" does not change this result. *See* Dkt. 61 at 17. Under the law, the correct standard for when § 112(f) does not apply is when "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *See Williamson*, at 1349. Whether a POSITA understands the general "concept" is irrelevant and not the correct legal standard.

Finally, after saying that an example of a BCE is a portion of a portion of a detonator, Dyna's says a POSITA "would also recognize that the '697 Patent describes the bulkhead connector element as an electrical connector of the ***top connector***," Dkt. 61 at 17 (emphasis added). The '697 Patent describes the top connector as "coupling" (i.e., interfacing with) a detonator so is not part *of* the detonator. Dkt. 56-2 (Ex. A) at 6:23–24; *see also* Fig. 32 (showing separately labeled top connector 14 and detonator 26). Given that even Dyna cannot identify what structure

corresponds to the BCE, the term is invalid as a POSITA surely would not be able to identify definite corresponding structure for the term.[1]

For the reasons given, the Court should find "bulkhead connector element" to invoke § 112(f) and find that, because the specification does not provide sufficient corresponding structure, the term is indefinite.

**VI.    "it is not possible to interrupt the electrical signal . . ." (Claim 2)**

For the same reasons argued in Defendant's Opening Brief, the PTAB recently found that it was more likely than not that this term is not enabled.  Ex. O at 34-37 (Institution Decision: Grant, PGR2021-00078 (Nov. 1, 2020) (Paper 10)).  Specifically, the PTAB noted that "both Patent Owner and its declarant argue as if the limitations at issue merely require a *less interruptible* electrical signal (as compared to the prior art) rather than one that it is 'not possible to interrupt,' as recited."  *Id.* at 36-37.  Dyna's responsive arguments make this same mistake.  The claim language requires that the electrical signal is "not possible" to interrupt, not that an interruption is less likely or that the assembly is less prone to interruption.  As a result, Dyna's argument that its disclosed assembly is an improved design is irrelevant to what it attempted to claim.

Even more problematic, Dyna does not even address Defendant's argument that this term is **also** indefinite.  Even if enabled, the requirement that it is "not possible to interrupt the electrical signal" inherently fails to provide notice of the boundaries of the claimed invention.  One cannot know whether it is "not possible" for an interruption to occur prior to the gun being used, and even

---

[1] The top connector cannot be right anyway: it is not in contact with the pin connector end, wirelessly or otherwise, Dkt. 56-2 (Ex. A) at Figs. 18–19, and it is not conductive and so it is not in "electrical contact," *id.*   at 7:1–4 (noting it is made of ULTRAMID® "15 % glass fiber reinforced, injection molding PA6 grade material"); *see also* Ex. N https://plastics-rubber.basf.com¬/¬global/¬en/-performance_polymers/¬products/¬ultramid.html  (noting ULTRAMID is a rubber polymer).

a successful run—or 100 successful runs—does not mean that an interruption could not occur on the next job.  As a result, the term is not only not enabled, it is inherently indefinite.

## Conclusion

For the foregoing reasons, this Court should adopt Defendants proposed constructions.

Dated:  November 22, 2021          Respectfully submitted,

/s/ *Amir Alavi*
Amir Alavi
State Bar No. 00793239
Demetrios Anaipakos
State Bar No. 00793258
Michael McBride
State Bar No. 24065700
Steven Jugle
State Bar No. 24083280
Joshua Wyde
State Bar No. 24060858
Louis Liao
State Bar No. 24109471
Colin Phillips
State Bar No. 24105937
Scott W. Clark
State Bar No. 24007003
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
   & MENSING, P.C.
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
(713) 655-0062
aalavi@azalaw.com
danaipakos@azalaw.com
mmcbride@azalaw.com
sjugle@azalaw.com
jwyde@azalaw.com
lliao@azalaw.com
cphillips@azalaw.com
sclark@azalaw.com

**ATTORNEYS FOR DEFENDANT
NEXTIER COMPLETION
SOLUTIONS INC.**

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically on November 22, 2021. As such, this document was served on all counsel of record pursuant to the Federal Rules of Civil Procedure.

<u>/s/ *Amir Alavi*        </u>
Amir Alavi